## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

EDWARD RONALD "BEAU"                    )
JONES,                                  )
                                        )
Plaintiff,                              )
                                        )
v.                                      )     **Case No.: 5:21-cv-00397-MHH**
                                        )
JAMIE KING, et al.,                     )
                                        )
Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Edward Ronald "Beau" Jones contends that Investigator Jamie King, Deputy Jake Abernathy, and Deputy Caleb Ryan violated his civil rights when they arrested him on March 7, 2020. (Doc. 1). The officers have moved for summary judgment on Mr. Jones's claims. (Doc. 86). To resolve the motion, the Court first summarizes the standard that a district court must apply when considering a summary judgment motion. Then, per that standard, the Court discusses the summary judgment evidence, presenting the evidence in the light most favorable to Mr. Jones. Finally, the Court evaluates the evidence under the law that governs Mr.

Jones's constitutional claims to see if there are disputed issues of fact that a jury must resolve.

I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure,

2

Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Still, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Additionally, where video evidence "obviously contradicts" the non-movant's "version of the facts," a district court must "accept the video's depiction instead of [the non-movant's] account." *Pourmoghani–Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.

Plaintiff Edward Ronald "Beau" Jones served in the military from 2008 until 2014. (Doc. 84-19, p. 6, tpp. 18:3–20:9). After he was discharged under honorable conditions, Mr. Jones started experiencing issues with drug abuse, homelessness, criminal activity, and violence. (Doc. 84-19, p. 6, tp. 20:1–6; Doc. 84-7, pp. 2-3, ¶ 3; Doc. 84-9, p. 3, ¶ 3; Doc. 84-11, pp. 2-3; Doc. 84-13, pp. 2–3; 84-14, pp. 2–3;

84-15, p. 2; 84-16, p. 2; Doc. 84-19, p. 5, tp. 15:7-22; Doc. 84-18, pp. 7, 11, tpp. 17:23–20:6, 34:19–35:22).  Mr. Jones has been diagnosed with PTSD.  (Doc. 84-19, p. 15, tp. 54:19–22).

On March 27, 2020, Mr. Jones was staying with his grandmother at her house in Elkmont, Alabama.  (Doc. 84-19, p. 4, tpp. 11:7–12:11).  Mr. Jones's father, Mike Jones, asked his second cousin, Elkmont City Councilman Charles Christopher, to call the police because he believed that Mr. Jones had drugs in the house.  (Doc. 84-18, p. 14, tpp. 46:18–47:14).  Councilman Christopher called Elkmont Chief of Police Donnie Johns.  (Doc. 84-7, p. 2, ¶ 4).  Councilman Christopher told Chief Johns that Mr. Jones had drugs and allegedly was cooking meth in the house. (Doc. 84-7, p. 3, ¶ 4; Doc. 84-8, p. 2, ¶ 2).

Chief Johns called Limestone County Narcotics Investigator Jamie King.  (Doc. 84-8, p. 2, ¶ 2; Doc. 84-21, p. 39, ¶ 3).  Chief Johns conveyed to Investigator King the information that he had been given about Mr. Jones and indicated that family members were concerned about an elderly grandmother who lived in the house and was bedridden.  (Doc. 84-21, p. 39, ¶ 3).  Chief Johns also called the Limestone County Sheriff's Office and reported that Investigator King was on his way to the Jones house, and "there may [have been] a fight about to start."  (Doc. 84-8, p. 3, ¶ 4).

Councilman Christopher went to his father's house across the street from the Jones house to wait for deputies to arrive. (Doc. 84-7, p. 3, ¶ 4). Councilman Christopher heard "a lot of yelling and banging" in the house. (Doc. 84-7, p. 3, ¶ 5; *see* Doc. 84-9, p. 3, ¶ 3). Councilman Christopher called the Sheriff's Office, reported the noise, and asked when a deputy would arrive. (Doc. 84-5). Dispatch responded that a deputy was on the way. (Doc. 84-5). Before the deputies arrived, Councilman Christopher called the Sheriff's Office again and stated that the "lady from across the street with the drugs is asking for ya'll to hurry; apparently something is happening." (Doc. 84-6). While Councilman Christopher and his father were waiting for the deputies to arrive, they saw Mr. Jones dump five-gallon buckets of liquid off the front porch. (Doc. 84-7, p. 4, ¶ 6; Doc. 84-9, p. 3, ¶ 4).

Limestone County dispatch informed Investigator King that there was a report of domestic violence at the home. (Doc. 84-21, p. 39, ¶ 3; Doc. 84-10, p. 2). Investigator King called for a patrol unit to meet him. (Doc. 84-21, p. 39, ¶ 3). Deputy Jake Abernathy met Investigator King at Elkmont High School. (Doc. 84-21, p. 39, ¶ 3). Dispatch informed Deputy Abernathy of a potential domestic situation at the house. (Doc. 84-22, p. 8, tp. 24:22–23).

Investigator King and Deputy Abernathy drove separately to the house. (Doc. 84-21, p. 39, ¶ 3). Deputy Abernathy's body camera recorded while the officers were at the house. (Doc. 84-22, p. 12, tpp. 39:20–40:4). When Investigator King

and Deputy Abernathy arrived, Mike Jones was standing in the driveway of the house.  (Doc. 84-22, p. 14, tpp. 45:16–46:6; *see* Doc. 84-23, p. 7, tp. 17:12–23).  Mike Jones told the officers that he had seen his son, Mr. Jones, in the front room "doing meth." (Doc. 84-3, at 0:40).  He reported that Mr. Jones had dumped liquid outside, and he indicated that Mr. Jones's grandmother was in the house.  (Doc. 84-3, at 0:40).

When Investigator King asked Mike Jones who owned the property, Mike Jones was unsure, but he indicated that it was either him or his mother.  (Doc. 84-3, at 00:55).  Investigator King clarified: "So it's y'all's property and you are giving us permission to go in." (Doc. 84-3, at 1:05).  Mike Jones responded "yes." (Doc. 84-3, at 1:05).  Mike Jones did not know if the front door was open, so he told the officers they could go in the back.  (Doc. 84-3, at 1:05).  Mike Jones told Investigator King that he did not think Mr. Jones was armed but stated that he "d[id]n't know." (Doc. 84-3, at 1:15).  Before the deputies entered the house, Mike Jones asked them to "please be careful." (Doc. 84-3, at 1:20).

Investigator King and Deputy Abernathy entered the house through the front door, walked a few steps, and looked left into a bedroom where Mr. Jones was seated behind a desk.  (Doc. 84-3, at 1:30; Doc. 84-21, p. 40, ¶ 3).  The officers drew their guns as they approached.  (Doc. 84-21, p. 9, tpp. 26:10–27:6; Doc. 84-3, at 1:30).

Investigator King asked Mr. Jones: "What's up Beau." (Doc. 84-3, at 1:40).[1] Investigator King's law enforcement badge was displayed on his belt buckle, (Doc. 84-29, p. 32, tp. 31:15–18); Deputy Abernathy was in his law enforcement uniform, (*see* Doc. 84-29, p. 32, tp. 31:20–21). Mr. Jones was familiar with Investigator King and knew that he was law enforcement. (84-19, p. 22, tpp. 82:4–83:15).

When he saw Investigator King, Mr. Jones picked up a large knife and moved from behind the desk towards the deputies. (Doc. 84-19, pp. 23–25, 27, tpp. 87:20–93:13, 103:17–104:11; Doc. 84-21, p. 10, tp. 30:5–15). Mr. Jones cursed and yelled "I will f*** you up." (Doc. 84-3, at 1:43). Investigator King stepped back, and Mr. Jones stopped advancing. (Doc. 84-21, p. 10, tpp. 31:16–32:5). Investigator King instructed Mr. Jones to put the knife down, but Mr. Jones did not comply. (Doc. 84-21, p. 40, ¶ 3; Doc. 84-19, p. 23, tpp. 87:18–88:18).

For more than 90 minutes, Investigator King spoke with Mr. Jones, coaxing him to put the knife down and come out of his room. (*See* Doc. 84-3, at 1:45–1:32:55; Doc. 84-19, p. 109, tp. 109:10–21). During the conversation, Mr. Jones seemed agitated, unstable, and paranoid; he made statements indicating that he would not let Investigator King take him into custody without incident, he thought

---

[1] Investigator King testified that he had previously encountered Beau Jones and learned that announcing "police" had not worked well. (Doc. 84-21, p. 9, tpp. 27:15–28:1).

he was being targeted by some unknown persons or entity, and he was suicidal.  (*See, e.g.*, Doc. 84-3, at 3:50, 12:35, 34:25 45:35, 1:19:55).  Based on his training and experience, Investigator King believed Mr. Jones was under the influence of methamphetamine.  (Doc. 84-21, p. 18, tpp. 62:1–12).[2]

Mr. Jones repeatedly demanded that the officers leave.  (*See* Doc. 84-3, at 1:43).  Investigator King testified that the officers did not leave because they believed Mr. Jones committed a crime in their presence, and they were concerned about Mr. Jones's safety.  (Doc. 84-21, pp. 40–41, ¶¶ 3, 5).  Deputy Abernathy radioed dispatch and asked for more units; more officers, including Deputy Caleb Ryan, soon arrived.  (Doc. 84-22, p. 18, tpp. 63:20–64:3; Doc. 84-21, p. 11, tpp. 34:18–35:4).

At some point, Mr. Jones put the knife down.  (Doc. 84-19, p. 23, tp. 88:12–18).  There were other potential weapons in the room–an ax and a saw–but Mr. Jones did not make movements towards them.  (Doc. 84-21, p. 14, tp. 48:5–8).  Mr. Jones had a small pocketknife on a clip in his front right pocket.  (Doc. 84-21, p. 14, tp. 45:1–15, p. 40, ¶ 3; Doc. 84-19, p. 24, tpp. 90:11–91: 1).  Mr. Jones asked to speak

---

[2] Mr. Jones disputes that he was under the influence and points out that no drugs were found in the home after the incident.  (Doc. 93, p. 9, ¶ 26).  Because the Court analyzes the constitutionality of officers' actions from the perspective of a reasonable officer under the circumstances, whether Mr. Jones was in fact under the influence is not dispositive.  *See McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).

with a female friend. (Doc. 84-19, p. 29, tpp. 109:13–110:5). When Investigator King got the friend on the phone, Mr. Jones spoke to her on speaker. (Doc. 84-1, at 1:20; Doc. 84-21, p. 12, tpp. 38:17–40:19). Investigator King instructed Mr. Jones to "get [his] hand off the knife;" Mr. Jones responded, "get your hand off your gun." (Doc. 84-1, at 00:45).[3] Investigator King told Mr. Jones that he could take the phone off speaker to have a private conversation and placed the phone on a shelf inside the room. (Doc. 84-1, at 2:00; Doc. 84-21, p. 12, tp. 40:5–40:13). Mr. Jones was unable to take the phone off speaker and handed the phone to Investigator King. (Doc. 84-1, at 2:30; Doc. 84-21, pp. 12–13, tpp. 40:20–41:17)

When he reached back into the room to hand Mr. Jones the phone, Investigator King grabbed Mr. Jones's right hand. (Doc. 84-21, p. 13, tp. 42:1–15; Doc. 84-19, p. 30, tp. 113:1–11). Mr. Jones "grabbed [Investigator King] by the shirt and slammed him on the ground." (Doc. 84-19, p. 30, tpp. 114:15–115:5). Mr. Jones punched Investigator King while he was on the ground. (Doc. 84-19, p. 30, tp. 115:9–13; Doc. 84-21, p. 13, tp. 43:7–23). Deputies Abernathy and Ryan entered the room to assist Investigator King and grabbed Mr. Jones. (Doc. 84-22, p. 23, tpp. 83:12–84:6;

---

[3] Mr. Jones does not deny touching the knife but asserts that "[t]here is no evidence that he made any aggressive movements toward the deputies." He contends that "[h]is behavior was defensive, not threatening." (Doc. 93, p. 11, ¶ 34). Mr. Jones's subjective motivation for his actions does not affect this Court's analysis of whether the officers' actions were objectively reasonable under the circumstances.

Doc. 84-23, p. 11, tp. 36: 1–12; Doc. 84-24, p. 25, ¶ 3; Doc. 84-19, p. 30, tp. 115:6–8; *see* Doc. 84-1, at 2:45). Mr. Jones testified that after other officers entered the room, the altercation "was kind of a blur." (Doc. 84-19, p. 30, tp. 115:1–8). At some point, Mr. Jones lost consciousness for a few seconds. (Doc. 84-19, p. 30, tp. 115:10–21).[4] The altercation lasted less than a minute. (*See* Doc. 84-1, at 2:50). When the officers gained control over Mr. Jones, he again cursed at them, exclaiming "I got you mother f***er" and "I will destroy your life." (Doc. 84-1, at 3:50, 5:30).

Mr. Jones sustained minor injuries during the brief altercation; he testified that his "neck was twisted up pretty bad," he had bruises, and he "might have had a little bloody nose." (Doc. 84-19, p. 17, tp. 62:1–19). Officer King sustained a busted lip and a laceration on his back. (Doc. 84-21, pp. 13, 14, tpp. 43:23, 45:21–23). Officer Abernathy sustained a cut on his head. (Doc. 84-22, p. 24, tpp. 85:11–19).

Mr. Jones was arrested for resisting arrest and assaulting an officer. (Doc. 84-22, p. 57). A deputy then transported Mr. Jones to the Limestone County Jail. (*See*

---

[4] In his deposition, Mr. Jones testified that he briefly lost consciousness and awoke to Investigator King hitting him with a closed fist "once or twice." (Doc. 84-19, p. 30, tp. 116:1–15). Mr. Jones testified that other officers were holding him by the arms and neck, (Doc. 84-19, p. 30, tp. 116:12–23), but he could not remember whether he was kicking when he woke up. (Doc. 84-19, p. 31, tp. 117:5–6). Mr. Jones has not pointed to the alleged punches in his opposition to the officers' motion for summary judgment, nor has he argued that the alleged punches constituted excessive force. Accordingly, the Court declines to consider this evidence. *See* FED. R. CIV. P. 56(c)(1)(A) (indicating that a party opposing summary judgment must cite "to particular parts of materials in the record"); FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials[.]").

Doc. 84-2). Mr. Jones later texted from jail: "Jamie King showed up. I stomped his ass. LOL." (Doc. 84-19, pp. 31, 142, tpp. 119:12–120:15).

At Mr. Jones's criminal hearing, Investigator King testified that though the officers believed in good faith that they had authority from Mike Jones to enter the Jones house, Mike Jones, as it turned out, did not have a legal interest in the house or the right to authorize entry. (Doc. 84-29, p. 59). The presiding state judge found that though the officers may have acted in good faith, they did not have valid consent to enter the house. (Doc. 84-29, pp. 29, 59, 64, 65, tpp. 28:11–24, 58:8–21, 63:12, 64:15–18). The state court also found that the officers did not have the right to enter Mr. Jones's room because they "didn't see" Mr. Jones threaten Investigator King with a knife on the body cam video. (Doc. 84-29, p. 61, tp. 60:14–19). The trial court held that, because the arrest was illegal, Mr. Jones could not be charged with resisting arrest. (Doc. 84-29, p. 65). Therefore, the state court dismissed the criminal charge against Mr. Jones. (Doc. 84-29, p. 69, tp. 68:3–5).[5]

---

[5] The state court judge was concerned about the relationship between Investigator King and Mr. Jones. The judge remarked that "there was more to this story." (Doc. 84-29, p. 64). The judge stated: "I think y'all have a history and that man, you don't like him and he don't like you, it's obvious he doesn't like you." (Doc. 84-29, p. 64). The judge suggested to Investigator King that he perhaps should have no additional interactions with Mr. Jones. (Doc. 84-29, p. 66). Mr. Jones testified in his deposition that he did not "have a bad history" with or "have any reason to dislike" Investigator King. (Doc. 84-19, p. 22, tp. 83:10–15). Nevertheless, this Court does not take issue with the judge's characterization of the events or the judge's instruction to Investigator King. This opinion does not contradict the state court judge's instructions because the state court judge could focus on the officers' motivations. Because this Court must apply the objective officer standard to

Mr. Jones then filed this action. He sued the Limestone County Commission and several officers for unlawful seizure/false arrest, failure to intervene in an unlawful seizure/false arrest, malicious prosecution, excessive force, violation of his due process rights, trespass, libel, slander, false imprisonment, and violations of the ADA. (Doc. 1). The Court dismissed the claims against all defendants except Investigator Jones, Chief Deputy Fred Sloss, Deputy Abernathy, and Deputy Ryan. (Doc. 30). The Court also dismissed all claims against these officers except for Mr. Jones's unlawful seizure/false arrest, failure to intervene in an unlawful seizure/false arrest, and excessive force claims. (Doc. 30). The Court later dismissed all claims against Chief Deputy Sloss pursuant to FED. R. CIV. P. 25. (Doc. 82). The officers' motion for summary judgment addresses all claims remaining in this case.

III.

Deputies King, Abernathy, and Ryan argue that qualified immunity shields them from Mr. Jones's claims. (Doc. 87, pp. 16–30). "Qualified immunity protects police officers from suit in their individual capacities for discretionary actions performed in the course of their duties." *Carter v. Butts Cnty.*, 821 F.3d 1310, 1318 (11th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v.*

---

evaluate qualified immunity, this federal court cannot consider the officers' motivations. *Cunningham v. Cobb Cnty., Ga*, 141 F.4th 1201, 1209 (11th Cir. 2025).

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  "This doctrine 'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1333 (11th Cir. 2024) (quoting *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010)).  When qualified immunity attaches, it "grants officials 'an entitlement not to stand trial.'"  *Miller*, 129 F.4th at 1333 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

District courts determine whether qualified immunity applies "on a claim-by-claim and defendant-by-defendant basis."  *Miller*, 129 F.4th at 1333 (citing *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018)).  "To enjoy qualified immunity's protection, 'a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred.'"  *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1323 (11th Cir. 2024) (quotation omitted).  If the official meets this burden, then the burden "shifts to the plaintiff to show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'"  *Jarrard*, 115 F.4th at 1323 (quotation omitted).  District courts have discretion in determining which of these two questions to answer first.  *Pearson*, 555 U.S. at 236.

The discretionary authority "requirement is 'readily satisfied' by 'police officers conducting arrest and investigative functions' while on duty." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1363–64 (11th Cir. 2024) (quoting *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019)).  District courts "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Because Mr. Jones's claims arise out of conduct Investigator King, Deputy Abernathy, and Deputy Ryan engaged in when investigating allegations of drug use, the officers have met their burden of showing that they acted within the scope of their discretionary authority.[6]  Therefore, to survive the officers' motion, Mr. Jones must carry his burden on his constitutional claims.

***

Mr. Jones asserts that his arrest violated the Fourth Amendment because the arrest was the product of an illegal search.  (Doc. 93, pp. 22–23).  The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. CONST. amend. IV.  Warrantless searches are "per se unreasonable" unless they fall under a

---

[6] The Court addressed the issue of whether the officers were acting within their discretionary authority in its order addressing the defendants' motion to dismiss.  (*See* Doc. 30, pp. 12–14).

14

"specifically established and well-delineated" exception. *Katz v. United States*, 389 U.S. 347, 357 (1967).

The officers' initial entry into the home was reasonable under the Fourth Amendment because Mike Jones consented to it. Searches "pursuant to valid consent are constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Officers may obtain valid consent from a person whose property is being searched, or "from a third party who possessed common authority over . . . the premises." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Even if a consenting party does not have the requisite authority over the premises, "there is no Fourth Amendment violation if an officer ha[d] an objectively reasonable, though mistaken, good-faith belief that the consent he . . . obtained [was] valid consent to search the area." *United States v. Brazel*, 102 F.3d 1120 (11th Cir. 1997) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186, 188 (1990)). The Government bears the burden of establishing that the consenting party possessed common authority or apparent authority over the premises. *See Rodriguez*, 497 U.S. at 181, 189. Accordingly, if a reasonable person under the circumstances would not doubt or inquire into the authority of a consenting party, an officer's entry based on that party's consent does not violate the Fourth Amendment. *See Rodriguez*, 497 U.S. at 188.

Although Mike Jones did not live in the Jones house, an objective officer would reasonably believe, based on the totality of the circumstances, that Mike Jones

had authority to consent to the officers' entry into the home.[7]   Mike Jones was waiting at the house when the officers arrives and told Investigator King that he or his mother owned the house, identified the best point of entry, and gave officers permission to enter.   (Doc. 84-3, at 0:40, 1:05).   Under these circumstances, a reasonable officer would not doubt or make further inquiries into whether Mike Jones had actual authority to consent to the officers' entry.

Additionally, there were exigent circumstances that would allow a reasonable officer to enter the house.  Officers "may enter a residence without a warrant when they have 'an objectively reasonable basis for believing that an occupant is . . . imminently threatened with [serious injury].'"  *Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 400) (2006)) (alterations in *Ryburn*).  As noted, Councilman Christopher heard "a lot of yelling and banging" in the house.  (Doc. 84-7, p. 3, ¶ 5; *see* Doc. 84-9, p. 3, ¶ 3).  Councilman Christopher

---

[7] Mike Jones's ownership interest, or lack thereof, is not dispositive of whether he had actual or apparent authority to give valid consent.  *See United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974) ("The authority which justifies the third-party consent does not rest upon the law of property[.]"); *Chapman v. United States*, 365 U.S. 610, 616–617 (1961) (holding that a landlord could not consent to search of tenant's house).  Common authority instead "rests on mutual use of the property by persons generally having joint access or control for most purposes."  *Matlock*, 415 U.S. at 172 n.7.

Likewise, the fact that Mike Jones had a key to the residence, came and went as he pleased, and made substantial improvements to the property are not relevant to this Court's consent analysis because there is no evidence showing that the officers knew this information before entry.

called the Sheriff's Office and reported the noise, (Doc. 84-5), and called again and stated that the "lady from across the street with the drugs is asking for ya'll to hurry; apparently something is happening." (Doc. 84-6). Limestone County dispatch informed Investigator King and Deputy Abernathy of a potential domestic situation at the house. (Doc. 84-21, p. 39, ¶ 3; Doc. 84-10, p. 2; Doc. 84-22, p. 8, tp. 24:22–23). These circumstances permitted warrantless entry into the Jones house.

The officers' entry into Mr. Jones's bedroom also did not violate the Fourth Amendment because exigent circumstances justified that entry too. Exigent circumstances justify an entry not only when an occupant is threatened with injury from a third party, but also when officers have grounds to believe that an occupant is at risk for self-injury. *See Roberts v. Spielman*, 643 F.3d 899, 906 (11th Cir. 2011) (holding that exigent circumstances justified entry where an officer was "performing a welfare check for a possibly suicidal person"). Under the circumstances that the officers encountered, they reasonably could conclude that Mr. Jones was at risk of serious injury, and posed a potential threat to his grandmother, based on his agitated state, access to weapons, and stated suicidal ideations.

Thus, for purposes of qualified immunity, the officers' entry into Mr. Jones's room did not violate the Fourth Amendment, and Mr. Jones's arrest was not the product of an illegal search.

*** 

17

Mr. Jones also asserts that the officers lacked adequate grounds for his arrest. (Doc. 93, p. 22). Arrests are unreasonable under the Fourth Amendment "unless supported by probable cause." *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023). Probable cause "exists where 'a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a 'substantial chance of criminal activity.''" *Edger*, 84 F.4th at 1236 (quoting *D.C. v. Wesby*, 583 U.S. 48, 60 (2018)). The presence of probable cause "constitutes an absolute bar to a section 1983 action for false arrest." *Case v. Eslinger*, 555 F.3d 1317, 1326–27 (11th Cir. 2009) (internal quotation marks and quotation omitted).

Moreover, qualified immunity attaches to an officer "if he had even 'arguable probable cause.'" *Edger*, 84 F.4th at 1235 (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010)). Arguable probable cause "exists where 'a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests.'" *Edger*, 84 F.4th at 1236–37 (quoting *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023)). Whether a police officer has arguable probable cause "depends on the elements of the alleged crime and the operative fact pattern," *Edger*, 84 F.4th at 1237 (quoting *Brown*, 608 F.4th at 735), but does not require proof of "every element of a crime," *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010).

Investigator King testified that he believed there was probable cause to arrest Mr. Jones for the crime of menacing. Under Alabama law, "[a] person commits the crime of menacing if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury." ALA. CODE § 13A-6-23(a).

Taking the facts in the light most favorable to Mr. Jones, Mr. Jones grabbed a knife while Investigator King stood in the doorway to Mr. Jones's room. (Doc. 84-3, at 1:50; Doc. 84-19, p. 23, tpp. 86:3–88:18). Mr. Jones moved towards Investigator King while holding the knife. (Doc. 84-19, pp. 27, 70–76, tp. 104:4–11; *see* Doc. 84-3, at 1:50). While holding the knife, Mr. Jones yelled "I will f*** you up," (Doc. 84-3, at 1:43; Doc. 84-19, p. 23, tpp. 86:1–88:11), and he did not drop the knife when Investigator King instructed him to do so, (Doc. 84-19, p. 23, tpp. 88:12–18). A reasonable officer in Investigator King's position therefore could have concluded, based on Mr. Jones's possession of a weapon, movement towards Investigator King, and verbal threat, that Mr. Jones had committed the crime of menacing under Alabama law by attempting to place Investigator King in fear of imminent serious physical injury. *See* ALA. CODE § 13A-6-23(a).

"If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." *Grider*, 618 F.3d at 1257. Therefore, the fact that Mr. Jones ultimately was arrested and charged with resisting arrest and assaulting an

officer rather than menacing is immaterial. Because Investigator King had at least arguable probable cause to arrest Mr. Jones for menacing, the officers are entitled to summary judgment on Mr. Jones's unreasonable seizure/false arrest claim.

Likewise, because the presence of probable cause bars Mr. Jones's unreasonable seizure/false arrest claim, the officers also are entitled to summary judgment on Mr. Jones's failure to intervene in an unlawful seizure/false arrest claim.

\*\*\*

Turning to Mr. Jones's excessive force claim, the "Fourth Amendment's freedom from unreasonable seizures includes the right to be free from excessive force." *Baxter v. Santiago-Miranda*, 121 F.4th 873, 887 (11th Cir. 2024) (citation omitted). "In excessive force cases, the first qualified immunity inquiry—i.e., whether a plaintiff's constitutional rights were violated—is governed by the Fourth Amendment's objective reasonableness standard." *Baxter*, 121 F.4th at 887 (internal quotation marks omitted) (quoting *Baker v. City of Madison*, 67 F.4th 1268, 1279 (11th Cir. 2023)); *see Graham v. Connor*, 490 U.S. 386, 395, 399 (1989). "[T]o determine whether the use of force is objectively reasonable, we carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake under the facts of the particular case." *Jones v. Ceinski*, 136 F.4th 1057, 1062 (11th Cir. 2025) (quoting *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)). A district court must "weigh

'the quantum of force employed'" against several factors, including "'the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight.'" *Jones*, 136 F.4th at 1062 (quoting *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015)). A district court considers these circumstances from the perspective of "a reasonable officer on the scene, bearing in mind that 'tense, uncertain, and rapidly evolving'" circumstances often require "split-second judgments" about the appropriate use of necessary force. *Barnett v. City of Florence*, 409 Fed. Appx. 266, 270 (11th Cir. 2010) (quoting *Graham*, 490 U.S. at 396–97)

A district court also weighs "'the relationship between the need and amount of force used and the extent of the injury inflicted.'" *Jones*, 136 F.4th at 1062 (quoting *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019)). "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Flowers v. City of Melbourne*, 557 Fed. Appx. 893, 895 (11th Cir. 2014) (quoting *Graham*, 490 U.S. at 396). When an officer "'uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands,'" the officer's use of force violates the Fourth Amendment. *Patel v. City of Madison*, 959 F.3d 1330, 1343 (11th Cir. 2020) (quoting *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014)).

Here, viewed in the light most favorable to Mr. Jones, the evidence shows that Investigator King and Deputy Abernathy were aware that Mr. Jones's family suspected that he was using methamphetamine and that Mr. Jones had argued with his father earlier that night. (*See* Doc. 84-22, p. 8, tp. 24:22–23; Doc. 84-3, at 0:40). When Investigator King and Deputy Abernathy entered the home, Mr. Jones picked up a knife and swore at them. (Doc. 84-3, at 1:50). Mr. Jones appeared agitated and made statements that would lead a reasonable officer to believe that he was suicidal. (*See* Doc. 84-3, at 1:50, 3:20, 27:10). Deputy King spoke with Mr. Jones for more than an hour-and-a-half, attempting to convince Mr. Jones to put the knife down and leave his room.

While Mr. Jones was reaching to get a phone from Investigator King, Investigator King grabbed Mr. Jones's right hand and attempted to restrain him. (Doc. 84-21, p. 13, tp. 42:1–15; Doc. 84-19, p. 30, tp. 113:1–11). Mr. Jones then "grabbed [Investigator King] by the shirt and slammed him on the ground," and punched him. (Doc. 84-19, p. 30, tpp. 114:15–115:13; Doc. 84-21, p. 13, tp. 43:7–23). Three other officers came to assist Investigator King and grabbed Mr. Jones. (Doc. 84-19, p. 30, tp. 115:6–8; see Doc. 84-1, at 2:45). At some point, Mr. Jones lost consciousness for a few seconds. (Doc. 84-19, p. 30, tp. 115:10–21). The altercation lasted less than a minute. (See Doc. 84-1, at 2:52–3:52). Mr. Jones sustained minor physical injuries, including a twisted neck, some bruising, and a

bloody nose.  (Doc. 84-19, p. 17, tp. 62:1–19).  Two officers suffered comparable injuries.  (Doc. 84-21, pp. 13, 14, tpp. 43:23, 25:21–23; Doc. 84-22, p. 24, tp. 85:11–19).

Based on this evidence, no reasonable jury could find that the officers used excessive force to arrest Mr. Jones.

As discussed, Investigator King had probable cause to believe that Mr. Jones had committed the crime of menacing.  Although Alabama law categorizes menacing as a misdemeanor, ALA. CODE § 13A-6-23(b), the crime nevertheless implies a risk of physical harm because the crime has an element intent to cause another person to fear an imminent injury.

Mr. Jones also appeared to pose a threat to the safety of himself and the officers.  Mr. Jones was agitated and had a history of methamphetamine use and violence.  Mr. Jones had brandished a large knife and had a second, smaller pocketknife within reach.  Mr. Jones stated that he was "ready" to die.  (Doc. 84-3, at 27:10).  Based on the totality of the circumstances, a reasonable officer could conclude that Mr. Jones posed a substantial threat because he was willing and able to harm himself or officers and to die in the process.

Because Mr. Jones was suspected of a crime involving a threat of physical injury and appeared to pose a threat to his safety and the safety of the officers, no

reasonable jury could find that the officers' attempts to restrain Mr. Jones constituted a use of force that "was both gratuitous and excessive."

As to the second requirement for qualified immunity, Mr. Jones cannot demonstrate that the law was clearly established to give the officers fair warning that the force used under these circumstances would violate the Fourth Amendment. "A plaintiff can show that an officer's use of force violated clearly established law in two ways: (1) 'a controlling and materially similar case declares the official's conduct unconstitutional;' or (2) 'the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" *Barnett*, 409 Fed. Appx. at 271 (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000)).

Mr. Jones has not identified a case "materially similar" to the circumstances of his arrest. Instead, the Eleventh Circuit cases Mr. Jones cites in support of his argument address the use of deadly force. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1327 (11th Cir. 2015) (reversing dismissal of a plaintiff's excessive force claim where plaintiff alleged that there was a shotgun in his lap when deputies approached him, but he did not reach for the gun, and the deputies "shot [plaintiff] without warning," tasered him "while he was on the ground bleeding from the gunshot wound and not offering any resistance or threat," and then "beat him

without cause."); *Turk v. Bergman*, 685 Fed. Appx. 785, 787 (11th Cir. 2017) (reversing summary judgment for defendants when there were material disputes of fact "as to whether [the plaintiff] posed an immediate threat of serious bodily harm to the officers, which was required for [the defendant] to use deadly force"); *Teel v. Lozada*, 826 Fed. Appx. 880, 886 (11th Cir. 2020) (reversing summary judgment for defendant where the defendant shot a suicidal woman who was holding a knife and walking in the defendant's direction, but had not threatened anyone, pointed the knife at the officer, or made any sudden movement); *Knowles v. Hart*, 825 Fed. Appx. 646, 649–50 (11th Cir. 2020) (affirming summary judgment for defendant where the defendant shot a woman when he "found himself in close quarters with an armed woman who refused to show her hands and . . . reached for her gun at least once" while responding to while responding to a call from a "distressed woman who had ingested an unknown drug"); *Perez v. Suszczynski*, 809 F.3d 1213, 1221 (11th Cir. 2016) (reversing summary judgment for the defendant where the defendant "shot a compliant, prostrate man in the back."). These cases do not clearly establish that the officers' use of non-deadly force under the circumstances of this case was unconstitutional.

Likewise, Mr. Jones has not demonstrated that the "unlawfulness of the [officers'] conduct was readily apparent." *See Barnett*, 409 F. Appx. at 271. The Eleventh Circuit addressed whether officers' conduct during a brief struggle to

restrain a suspect was obviously unconstitutional in *Barnett v. City of Florence*, 409 Fed. Appx. 266, 268 (11th Cir. 2010). In *Barnett*, officers approached a man while responding to a call about a gun fight. As an officer released the man's arm after restraining him for a frisk, the man jerked away, stepped towards the officer, and swore. Another officer intervened, pushed the man away, and told him to leave. The man then shoved the intervening officer. One of the officers attempted to gain control of the man and brought him to the ground. The beginning of the incident was recorded on a dashcam, but the struggle on the ground was not visible on the video. Nevertheless, the video's audio demonstrated that the man continued resisting arrest. When an officer gained control of the man, he "felt his left elbow 'pop'" while an officer put the man's "left arm to the small of his back." *Barnett*, 409 Fed. Appx. at 268. "The entire incident, from the first push to the final handcuffing, lasted about one minute." *Barnett*, 409 Fed. Appx. at 268.

Addressing whether the plaintiff had demonstrated a "clearly established" constitutional violation, the Eleventh Circuit held that the man's "combative nature," "persistent resistance," and "multiple verbal threats" would not "lead every reasonable officer in the Defendants' position to conclude that the force was unlawful" and affirmed summary judgment for the defendants. *Barnett*, 409 Fed. Appx. at 271.

Like the plaintiff in *Barnett*, Mr. Jones was acting in an agitated and combative manner, verbally threating officers, and resisting arrest.  Mr. Jones's agitation persisted longer than the plaintiff's aggravation in *Barnett*, and, unlike in the plaintiff in *Barnett*, Mr. Jones held a weapon during his interaction with police.  Thus, the officers had reason to expect that the force they used to arrest Mr. Jones was not unconstitutional.  Additionally, although much of the incident leading to Mr. Jones's arrest is not visible on the body cam recording, the audio demonstrates that the physical struggle lasted only a short period of time as in *Barnett*.  Thus, the circumstances surrounding Mr. Jones's arrest would not lead every reasonable officer to believe the force used was excessive and therefore unlawful.

Accordingly, the officers are entitled to summary judgment on Mr. Jones's excessive force claim.

IV.

Accordingly, the Court grants defendant's motion for summary judgment.  By separate order, the Court will enter a final judgment.  The Clerk of Court shall please TERM Doc. 86.

**DONE** and **ORDERED** this October 14, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

27